IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
SENIOR JUDGE WALKER D. MILLER

Civil Action No. 07-cv-02704-WDM-MJW

PURNENDU SARKAR,

      Plaintiff,

v.

NANCY MCCALLIN, in her individual and official capacity, et al.,

      Defendants.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT AND OBJECTIONS TO ORDERS OF MAGISTRATE JUDGE

---

Miller, J.

      This case is before me on the Motion for Summary Judgment (doc no 119) filed by Defendants.  Also before me are Plaintiff's objections (doc nos 76 and 100) to two orders issued by Magistrate Judge Michael J. Watanabe.  I have reviewed the parties' written arguments and the evidence submitted with their briefs.  For the reasons that follow, Defendants' motion will be granted.  The objections to the orders issued by Magistrate Judge Watanabe will be overruled.

### Background[1]

      This is an employment discrimination case arising under the First Amendment and 42 U.S.C. § 1981.  Defendant Nancy McCallin is the president of the Colorado Community

---

[1]The following facts are taken from the parties' briefs and attached exhibits and are undisputed unless otherwise noted.  Plaintiff purports to dispute a number of facts without offering contrary evidence; Plaintiff's arguments and credibility attacks are insufficient to raise a genuine issue of fact with respect to Defendants' evidence in this regard.

College System ("CCCS").  CCCS is governed by the State Board for Community Colleges and Occupational Education (the "Board"), an agency of the State of Colorado.  The remaining Defendants are various members of the Board and high level managers of CCCS, all of whom are now named in this lawsuit in their official capacities only.  As President, Dr. McCallin governs the 13 community colleges that comprise CCCS as well as the CCCS system office.  She is assisted by Defendant Barbara McDonnell, the Executive Vice-President and General Counsel for CCCS, and Defendant Kristen Corash, the Associate Vice-President of Planning and Research for CCCS.

Plaintiff, who is of East Indian descent, is the former Chief Information Officer ("CIO") and Vice President of Technology for CCCS.  Plaintiff was selected after a search process that began in summer and fall of 2004.  Several candidates were identified by a screening committee and were recommended for interviews.  Dr. McCallin interviewed the three or four finalists for the CIO position, including Plaintiff; she had the final choice and selected Plaintiff for the CIO position.  Plaintiff signed the formal acceptance of the CIO position on December 15, 2004.  He officially began his duties with CCCS in January 2005.  However, prior to his official start date, he attended meetings and performed other unpaid activities connected with his new job.

As CIO, Plaintiff was responsible for overseeing the implementation of a new Enterprise Resource Planning System ("ERP"), a "centralized, standardized, integrated, system-wide information technology configuration" for the 13 colleges.  C.R.S. § 23-60-104.5.  The ERP system was mandated by state law before Plaintiff was hired and was required to be completed on or before June 30, 2006.  *Id.*  CCCS, however, could choose which software it would use for the ERP project.  Before Plaintiff was hired, CCCS had

used a number of programs from a company called SunGard/SCT Banner ("SunGard"). SunGard submitted a proposal for the ERP project at CCCS. According to Dan Tacker, the interim CIO prior to Plaintiff's hire, SunGard's Banner software was the "de facto standard" in higher education ERP systems in Colorado. A number of Colorado institutions had already implemented or were in the process of implementing Banner. In early December 2004, the Board had unanimously approved a resolution to adopt the SunGard proposal.

Plaintiff did not agree that Banner was the best product or, alternatively, suggested that SunGard be subject to a competitive bid, rather than a sole source contract. In December 2004, Plaintiff communicated these issues to Mr. Tacker and to Paul Robinson, the Chief Sourcing Officer for the Office of Innovation and Technology ("OIT") in the Governor's Office. At the time, Mr. Robinson was negotiating with vendors for the ERP contract for two other educational institutions. These institutions ultimately selected SunGard without a competitive bid.

On January 12, 2005, the State Controller approved the request from CCCS to acquire Banner from SunGard via a sole source contract. Plaintiff's responsibility thereafter, according to his own deposition testimony, was to manage the contract and to make sure that SunGard was delivering in accordance with the contract.

The ERP implementation had a number of problems and Plaintiff's relationship with SunGard was strained. Although it is undisputed that the Banner software had some inherent deficiencies, Plaintiff was apparently quite adversarial with SunGard, which created difficulties in resolving the issues encountered. According to several witnesses, Plaintiff blamed SunGard for every problem that arose in the ERP implementation. Plaintiff also believed that SunGard had made improper charges and he therefore withheld

payments to SunGard.  As a result, at one point, the President of SunGard threatened during a regularly scheduled monthly Board meeting that SunGard would withdraw its resources from the project unless SunGard was paid and Plaintiff was fired.

To assist with the dispute with SunGard, Plaintiff hired Daniel Graham, an attorney, in February 2006 to represent CCCS.  Mr. Graham had significant experience in negotiation of ERP implementation agreements and other information technology issues.  Plaintiff also was put in contact with Jim Ritchey, who with his company Delta Initiatives had previously contracted with DeVry University.  There, Mr. Ritchey had acted as the interim CIO and managed the IT organization, including the implementation of a student system that had been having significant problems before his arrival.  Mr. Ritchey and Delta Initiatives were retained by Mr. Graham as subcontractors to work on the CCCS/SunGard dispute.

On or around February 15, 2006, SunGard sent a formal notice to CCCS that CCCS was in default under the contract for failing to pay approximately $1.9 million in fees to SunGard.  In meetings with CCCS representatives, Mr. Ritchey, and Mr. Graham, Plaintiff asserted that the problem was that SunGard had not submitted appropriate time sheets and accounts of work performed.  In addition, Plaintiff maintained that SunGard had provided software that would not work in the CCCS environment and CCCS was owed a refund for these products.  However, when he began reviewing the project, Mr. Graham was unable to find documentation of the requirements and specifications for the project and found that change management documents and project plans had not been updated in a long time.

Around March 2006, Mr. Graham and SunGard had outlined a framework for mediating the dispute.  Relations between SunGard and Plaintiff were so strained,

4

however, that SunGard did not want Plaintiff involved in the settlement negotiations.[2]

By spring 2006, it was apparent that the ERP system as implemented was not working.  Plaintiff again placed the entire responsibility for the failure on SunGard.  On or about May 31, 2006, Plaintiff announced that an ERP Student System powered by a portal known as Luminis would go live on June 1, 2006, and be available for student registration. Thereafter, however, serious problems were caused by the Luminis portal; students were unable to register for fall classes because of a number of systematic malfunctions.  Dr. McCallin decided on June 29, 2006 to take the Luminis portal down and the system began functioning again.  However, the Luminis problems caused a substantial drop in student enrollment at the time.

There were other delays in testing and implementation.  Specifically, modules for the Finance and HR-Payroll departments, part of the ERP project, were delayed until October 2006.  In June and July 2006, Dr. McCallin also began to receive complaints from several college presidents complaining about the performance of the ERP and the performance of the information technology department not being responsive to their needs.

In July 2006, Dr. McCallin, in consultation with Barbara McDonnell, decided to obtain an audit of the status of the ERP implementation and retained Mr. Ritchey for this purpose. In its final version, the objective of the audit was to "review the current state of the project and provide recommendations of the probability of a successful rollout of the HR and Payroll components on October 1st."   Student System Project Review, Exh. 35 to Defendants' Motion for S.J. (doc no 120-36), at 4.  In addition, the audit was to focus on the

---

[2]Although not entirely clear from the record, it appears that Plaintiff continued to have a role in the dispute negotiations despite SunGard's demand.

cause of the Luminis problem, the major problems with the project and possible solutions, whether to go live with the existing version of the system or to upgrade immediately, whether the SunGard system could handle the peak load of registrations/finance/HR/financial aid, the stability of the product, and other related matters. *Id.* Dr. McCallin was particularly interested in learning whether the problems encountered were solely due to SunGard and the Banner product, as settlement negotiations were still ongoing. Dr. McCallin began formulating questions and received proposed questions from Mr. Graham, around July 12 and 13, 2006. The audit required Mr. Ritchey and his team to interview key IT personnel and business process owners to get a clearer picture of the project's status. Around July 27, 2006, Plaintiff confirmed that he had received a list of questions from Mr. Ritchey for the audit.

The negotiations with SunGard were at a critical point at the end of July and early August. Around that time, Dr. McCallin attempted to contact Plaintiff regarding some questions for settlement discussions, but was unable to reach him. On Monday, July 31, 2006, Dr. McCallin received an email from Plaintiff's administrative assistant stating that Plaintiff was taking annual leave and could not be reached until Thursday afternoon. Plaintiff had not informed Dr. McCallin, or any other management level person, in advance that he would be totally unavailable during this time period. Mr. Ritchey interviewed Plaintiff for the purpose of the audit on August 3, 2006. Mr. Ritchey was unable to review for the audit a number of project documents, but it is unclear whether this was because the documents were not available to him or did not exist.

On August 8, 2006, the system had gone down again and students were unable to register. Dr. McCallin called a meeting that took place in Plaintiff's office. Dr. McCallin

believed that Plaintiff did not know how serious the situation was or did not know how to fix it. Plaintiff opined that the problem was caused by the SunGard software. Mr. Ritchey believed that it was related to the supporting Oracle system, which interacted with the SunGard product. Plaintiff appeared to resist bringing in Oracle resources to assist. However, Oracle experts were brought in thereafter and the problem was resolved. In addition, at that August 8 meeting, Dr. McCallin received information from other members of the IT staff regarding the project and SunGard issues that appeared to conflict with what Plaintiff had told her.

On August 9, 2006, Dr. McCallin spoke with Mr. Graham about her concerns with the ERP project. In particular, she expressed concerns over the lack of communication with Plaintiff, his recent unavailability, the lack of clear understanding of how the project would be successfully concluded if Plaintiff continued to work with SunGard, the Luminis failure, and Plaintiff's recent recommendations. She also asked about Mr. Ritchey's background and availability.

The audit was finalized on August 14, 2006; Dr. McCallin received a verbal overview from Mr. Ritchey approximately a week earlier. She decided to terminate Plaintiff's employment after she received the audit information and after the August 8, 2006 meeting. Among the issues identified by Mr. Ritchey in his audit were the following, which related to project management:

> Communication - After talking to business and technology resources, it was clear that most people did not know the plan, what was in scope, what was being worked on, what was considered done, and when it would be done.
>
> Technology driven - The project appears to be technology driven and not business driven. Most of the status

> communication involved the status of installed software, not the business results of the software installation. It appears as though the IT team is focused on having the software installed and up and running. The problem is that the software can be up and running but not meet the business needs.
>
> Vendor management - Project plans and status reports tend to report the time spent by vendors, where as the important items to track are deliverables. It is unclear what the vendor is doing, when it will be done, and the quality of the deliverable.

Student System Project Review, Exh. 35 to Defendants' Motion for S.J. (Doc no 120-36), at 5-6. Mr. Ritchey also found that no formal requirements documentation had been provided by the participants, which meant that CCCS and SunGard would have a difficult time determining when the project's deliverables were actually done. The audit provided examples and descriptions of how project management and quality assessment failures had contributed to the problems with the project. Deposition testimony from several IT employees corroborates the management and communication problems that Mr. Ritchey believed had hindered the project.

Mr. Graham also concurred that several of these issues had affected his ability to negotiate with SunGard over the resolution of the billing disputes. Specifically, Mr. Graham felt that Plaintiff did not have a clearly understandable set of objections to SunGard's invoices and that Plaintiff's handling of the billing process and lack of transparency on the approval of time sheets greatly exacerbated the billing dispute. He also opined that the lack of a change management plan and specifications and requirements created difficulties in the negotiations and project implementation. Nonetheless, the billing dispute was resolved around August 11, 2006 and, as a result, CCCS received a significant refund from SunGard (over $2 million).

Dr. McCallin created a list of reasons for her decision to terminate Plaintiff.  These included her belief that Plaintiff had rolled out a system that did not work and was not tested, the problems with Luminis[3], the lack of communication about what staff was doing and where the project actually was, disagreements about need for Oracle experts, discrepancies between information from Plaintiff and from others, various technology related issues, vendor management problems, the lack of a workable project plan, issues relating to annual leave and the budget, Plaintiff's taking annual leave without advance notice and being inaccessible during that time, lack of attention to business needs, and friction with Defendant Corash, discussed further below.  Exh. 37 to Defendants' Motion for S.J. (doc no 120-38).

As noted above, Ms. Corash was the Associate Vice-President of Planning and Research for CCCS.  She and Plaintiff had a difficult relationship.  She felt that he was inserting himself on the business side, for example, by making decisions about the appearance and content of the website, which was supposed to be her domain.  At one point, Plaintiff asked an outside agency to copy him on all email correspondence, particularly email to Ms. Corash, but did not inform Dr. McCallin or Ms. Corash that he had done this.  There is a factual dispute as to whether Plaintiff responded to Ms. Corash's demand for an explanation for this action, but it is undisputed that Ms. Corash was disturbed by this request and believed that he was disrespectful to her.

On August 18, 2006, Plaintiff met with Dr. McCallin and Ms. McDonnell and was

---

[3]Plaintiff claims in his Response brief that Kristen Corash was in charge of the Luminis project and therefore responsible for its failure, but this is not supported by the record.

9

informed that his employment was being terminated. Dr. McCallin intended to review the reasons for the termination with Plaintiff but he did not wish to hear them. Plaintiff was told he would be placed on administrative leave; there is a dispute about the length of leave offered at this meeting. There was some effort to arrive at a settlement in exchange for a release of claims but this effort was unsuccessful. Mr. Ritchey was hired as the interim CIO, effective August 21, 2006.

On August 23, 2006, Plaintiff rejected an offer of three months salary in exchange for a release of claims via an email to Ms. McDonnell. In that same email, Plaintiff claimed that there was "clear retaliation, discrimination, and an attempt to silence my voice through intimidation . . . ." Exh. 44 to Defendants' Motion for S.J. (doc no 120-45). On August 30, 2006, Plaintiff also sent another email to Board member Barbara McKeller, again referring to his "whistleblowing" activities in connection to the ERP project. Exh. 45 to Defendants' Motion for S.J. (doc no 120-46). He sent another email on August 30, 2006, to Cindy Hesse, the Manager of Human Resources, again referring to his August 23, 2006 email as "my grievance against discrimination, intimidation in a hostile work environment, and retaliation." Exh. 44 to Defendants' Motion for S.J. (doc no 120-45). CCCS had an antidiscrimination policy in place while Plaintiff was employed, but before his termination he had not previously submitted a grievance pursuant to this policy or the CCCS's grievance procedure.

On August 29, 2006, Plaintiff met with a CCCS employee off-site to return three laptop computers issued to him. He returned two machines and told the employee that one of the laptops had been left at his former office at CCCS. However, when the office was searched, the laptop was not found. In addition, it appeared from security video that

10

Plaintiff may have taken the computer with him when he left. Because of this, Ms. Hesse wrote Plaintiff a letter demanding the return of the laptop and threatening to report the matter to police. Exh. 50 to Defendants' Motion for S.J. (doc no 120-51). The Colorado Bureau of Investigation was also notified. However, thereafter it was determined that the videotapes were either not available or not sufficiently clear enough to go forward with the matter. The letter was not released until a Colorado Open Records Act request was made after Plaintiff went public with his allegations against CCCS.

After Plaintiff's termination, Dr. McCallin asked Cindy Hesse to confirm certain employment information with Plaintiff's previous employers. Ms. Hesse requested and obtained Plaintiff's previous dates of employment from several of Plaintiff's previous employers.

Plaintiff's complaint contains three claims for relief: (1) violation of Plaintiff's First Amendment rights pursuant to 42 U.S.C. § 1983; (2) national origin discrimination pursuant to 42 U.S.C. § 1981; and (3) retaliation pursuant to 42 U.S.C. § 1981.

<u>Standard of Review</u>

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying 'a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.'" *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart*

*Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).  Then, "[t]o avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."  *Id.*

Discussion

Defendants first argue that all Defendants other than Nancy McCallin should be dismissed from this case because they are named in their official capacities only, are immune under the Eleventh Amendment, and only Dr. McCallin can be the subject of injunctive relief as she is the official capable of reinstating Plaintiff, should he prevail. Because I conclude that Plaintiff's claims fail on the merits, as discussed further below, I need not address this part of the motion.

1.    First Amendment Claim

Defendants argue that Plaintiff's First Amendment claim fails because all of the "speech" at issue was made pursuant to his official duties and is therefore not constitutionally protected.  I agree.

A five part test is employed to determine whether a public employee's First Amendment rights were violated by an employer's adverse action: (1) the court must determine whether the employee speaks "pursuant to [his] official duties;" (2) if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern; if the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends; (3) if the employee speaks as a citizen on a matter of public concern, the court must determine "whether the employee's interest in commenting on the issue outweighs the interest of the state as employer;" (4) assuming the employee's interest

12

outweighs that of the employer, the employee must show that his speech was a "substantial factor or a motivating factor in [a] detrimental employment decision;" and (5) if the employee establishes that his speech was such a factor, "the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech." *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1202-3 (10th Cir. 2007) (citations omitted).   The first three steps are to be resolved by the district court, while the last two are ordinarily for the trier of fact.  *See Cragg v. City of Osawatomie*, 143 F.3d 1343, 1346 (10th Cir.1998).

Plaintiff's First Amendment claim appears to rely entirely upon statements he made regarding SunGard and his criticisms of the Banner product.  His complaint alleges that he "spoke out about improprieties he observed in the handling of the Banner project, before and after his termination."  Second Amended Complaint (doc no 45) at ¶ 23.  There is no dispute that as CIO, Plaintiff's job was to oversee the ERP implementation and ensure that SunGard performed the contract.  All the examples of his "speaking out," whether in discussions with McCallin and other CCCS staff, others in field, or at Board meetings, were all made by him as a representative of CCCS in his capacity as CIO.  They all related to the ERP project and his management thereof.  These are classic examples of "speech that owes its existence to a public employee's professional responsibilities."  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

Plaintiff argues in response that he "went above and beyond his official duties" by speaking out about SunGard's actions and waste of public funds.  He also contends that he was only responsible for the "technical" side of the project; this, however, directly contradicts his own deposition testimony, which shows that he had broad management

13

authority and had primary responsibility for enforcement of the SunGard contract.  He also argues that because he spoke to persons not directly involved in the implementation, such as a state senator who inquired about the project, this means the speech was not part of his official duties.  These arguments are unavailing.  Plainly, Plaintiff would have had no occasion for these discussions but for his position and duties.  Moreover, it apparent from the context that in every case he was speaking in his role as CIO and on behalf of CCCS, not as a private citizen.[4]  Accordingly, I agree that there is no genuine issue of material fact regarding Plaintiff's ability to establish this prong of his First Amendment claim and therefore the claim fails.

2.    National Origin Discrimination

A plaintiff alleging employment discrimination may prove intentional discrimination by direct or indirect evidence.  In the absence of direct evidence, the analysis set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-804 (1973), provides the framework for assessing indirect, or circumstantial, evidence.  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000).  The *McDonnell Douglas* framework applies to cases brought under § 1981, as well as Title VII.  *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004).  Under this analysis, the plaintiff bears the initial burden of presenting a *prima facie* case of discrimination.  *Kendrick*, 220 F.3d at 1226.  The essential purpose of the *prima facie* test is to eliminate "the most common nondiscriminatory reasons for the

---

[4]Even if some of the statements Plaintiff made before his official hire date could arguably be considered to be protected, the lapse of time (over a year and a half) between those statements and his termination diminishes any inference of a causal connection.  *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir. 1999)  (In employment discrimination context, three month interval between protected activity and adverse action, standing alone, is insufficient to show causation)

plaintiff's rejection." *Id.* at 1227 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981)). *See also St. Mary's Honor Center*, 509 U.S. at 506 (*prima facie* case "in effect creates a presumption that the employer unlawfully discriminated against the employee") (quoting *Burdine*, 450 U.S. at 254) (alteration in quoted material). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its action. *Kendrick*, 220 F.3d at 1226 (quoting *McDonnell Douglas*, 411 U.S. at 802). If the defendant presents such a reason, the plaintiff bears the "ultimate burden" of establishing that these proffered reasons are a pretext for unlawful discrimination. *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1167 (10th Cir. 2000).

The plaintiff may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy or credence and hence that the employer did not act for the asserted non-discriminatory reasons." *Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303, 1308 (10th Cir. 2005); *see also Kendrick*, 220 F.3d at 1230 (three ways of showing pretext are: (1) evidence that the defendant's stated reason for the adverse action was false; (2) evidence that the defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or practice when making the adverse decision).

For the purposes of summary judgment, Defendants concede that Plaintiff may be able to establish a prima facie case. They argue, however, that Plaintiff cannot demonstrate that the reasons for Plaintiff's termination were a pretext for discrimination

based on Plaintiff's national origin.  Again, I agree.

As Defendants note, ""[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City and County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (internal quotation marks and alteration omitted); *see also Kendrick*, 220 F.3d at 1231 ("[A] challenge of pretext requires us to look at the facts as they appear to the person making the decision to terminate plaintiff."). Thus, even if the stated reasons later prove to be untrue, I must examine whether the employer believed those reasons and made a good faith decision.  "The reason for this rule is plain: our role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young v. Dillon Comp.,* 468 F.3d 1243, 1250 (10th Cir. 2006) (citations omitted).

There is sufficient evidence on the record to indicate that Dr. McCallin had reason to believe that Plaintiff was not succeeding in his role as CIO.  The ERP project had a number of problems, and while some of them were caused by the SunGard software, Dr. McCallin received information sufficient for her to believe in good faith that Plaintiff's management and personal style created or exacerbated the problems that hindered the success of the project.  Dr. McCallin relied to a large degree on the criticisms contained in Mr. Ritchey's audit report.  Although Plaintiff contends that Mr. Ritchey may have been angling for Plaintiff's job and/or was biased because he did not identify the problems with the Banner software, there is no evidence that the criticisms arose out of any discriminatory motive or that Dr. McCallin had reason to believe that they did.  Plaintiff also asserts that

16

many of the points made by Mr. Ritchey were untrue; this is immaterial, however, as there is no evidence to indicate that Dr. McCallin had reason to think that they were untrue.

It is apparent that Dr. McCallin did not have the technical expertise to evaluate the state of the project or to diagnose the causes of the problems encountered and therefore justifiably relied on Mr. Ritchey's observations and opinions.  In addition, Dr. McCallin had personal knowledge of the friction between Plaintiff and SunGard, had witnessed the numerous problems with the ERP implementation, and had seen Plaintiff and Ritchey disagree over the cause of the August 2006 problems, with Ritchey's proposed solution (using Oracle experts) working to remedy the issues.  She had also received conflicting information from employees and Plaintiff about the status of the project and issues with SunGard.  Similarly, Dr. McCallin was aware, based on her personal experience, of the friction between Plaintiff and Ms. Corash and of his unavailability during a critical time, without giving her advance notice.  Plaintiff may disagree about the assessment of his performance, but this is not sufficient to give rise to an inference that Dr. McCallin's motives were discrimination rather than genuine doubts about Plaintiff's leadership of the IT department.

Finally, although not addressed by Defendants, I note that Defendants are entitled to a presumption that the termination was non-discriminatory, since Dr. McCallin, who made the decision to discharge Plaintiff, also hired Plaintiff and gave him a raise in 2005. This entitles the Defendants to a "same actor" inference.  *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006) (where employee was hired and fired by the same actor within a relatively short time span, there is a strong inference that the employer's stated reason for acting against the employee is not pretextual).

17

In his response, Plaintiff offers little in the way of evidence to rebut Defendants' showing that Dr. McCallin relied on non-discriminatory reasons for terminating Plaintiff's employment. He asserts, apparently for the first time, that McCallin made fun of his accent. Declaration of Purnendu Sarkar, Exh. A to Plaintiff's Response (doc no 141-2) at ¶ 39. Plaintiff's conclusory assertion will not be considered for the purpose of summary judgment, as he gives no information about actual words spoken or action taken by Dr. McCallin, no specifics such as when or in what context the alleged mocking occurred, and apparently never made a complaint either to Dr. McCallin or anyone else before his termination, or even before filing his Response brief. *Bones v. Honeywell Int'l., Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings.") (citations omitted).

Plaintiff also argues that the accusation that he had stolen a laptop also creates an inference that his termination was discriminatory. Again, however, Plaintiff's evidence does not demonstrate that Dr. McCallin and Ms. Hesse's belief that Plaintiff had taken a laptop computer was not in good faith. It is undisputed that three computers were checked out to Plaintiff but only two were returned. There is nothing on the record to indicate that Dr. McCallin caused a letter to be sent demanding the return of the computer because of animus towards persons of East Indian descent, rather than from a good faith belief that he had failed to return the laptop.

Plaintiff's final contention that Dr. McCallin replaced three other minority executives, which demonstrates discrimination. He provides no evidence regarding the circumstances of those three executives, including their positions and length of service, whether they were involuntarily discharged, when, by whom, and for what reasons. Plaintiff's assertion,

18

therefore, is not sufficient to create a genuine issue of material fact regarding pretext.

Perhaps Plaintiff's own words and testimony most strongly undermine his assertion that he was let go because of discrimination.  In his affidavit, he claims that "Dr. McCallin decided to get rid of me, because Brian Madocks with SunGard did not want me on the project and because I was outspoken about the lack of progress on the Banner project due to the defective SunGard products."  Declaration of Purnendu Sarkar, Exh. A to Plaintiff's Response (doc no 141-2) at ¶ 30.  This argument is also repeated throughout his Response brief.  If, as Plaintiff asserts, this was the "real" reason for his termination, it does not give rise to an inference that McCallin was motivated by discrimination.

3.   Retaliation

The burden shifting approach also applies to claims of retaliation.  To establish a prima facie case of retaliation, plaintiffs must show that: (1) they engaged in protected opposition to discrimination; (2) that a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection exists between the protected activity and the adverse employment action.  *Somoza v. University of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008).  A challenged action is materially adverse if it "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern & Santa Fe Rwy Co. v. White*, 548 U.S. 53, 68 (2006).  The particular circumstances surrounding the act also should be considered in determining the impact of an employer's act.  *Id.*

Defendants argue that Plaintiff cannot establish a prima facie case and, moreover, cannot demonstrate that the alleged adverse action was a pretext for retaliation.  Plaintiff's claim is based on his emails of August 23, 2006 and August 30, 2006, which could amount

to protected opposition to discrimination.  Therefore, only actions taken after that time could constitute adverse actions for the purposes of this claim.  This includes sending Plaintiff a letter demanding the return of a laptop[5] and the reverification of Plaintiff's employment history.[6]

Even if the letter to Plaintiff regarding the missing laptop could be considered a materially adverse action, Plaintiff has not come forth with evidence showing that it was issued in bad faith, as discussed above.  In addition, although there is some dispute as to the reasons that Ms. Hesse contacted Plaintiff's former employers to confirm his dates of employment, there is no indication that any information was provided to these or other employers to Plaintiff's detriment.  No reasonable jury could find that an employee would be dissuaded from making a claim of discrimination by the prospect that, post-termination, the employer would verify employment dates from previous employers.  This type of information is routinely exchanged and such an inquiry casts no shadow of suspicion or otherwise harms the employee.  Plaintiff offers nothing more than pure speculation to support his assertion that this inquiry "indicated suspicion about [Plaintiff] to his prior employers," which might somehow affect their evaluation of him to future employers and thereby jeopardize his future job prospects.  Accordingly, I agree with Defendants that this

_____

[5]Although Plaintiff argues that the public release of the letter was retaliatory, there is no indication that any of the Defendants was responsible for the release, since it was in response to an Open Records Act request.

[6]Plaintiff's assertion that his termination occurred on August 31, 2006, after his complaint of discrimination, has no merit.  It is undisputed that he was told on August 18, 2006 of his discharge, regardless of the date of his actual official last day of employment.  Because the decision to terminate Plaintiff's employment occurred before he complained of discrimination, Plaintiff's firing cannot be considered a retaliatory adverse action.

action was not materially adverse.

4. <u>Appeal of Magistrate Judge Orders</u>

Plaintiff also appeals two orders issued by Magistrate Judge Watanabe.  I may modify or set aside an order of a magistrate judge if that order is "clearly erroneous or contrary to law."  Fed. R. Civ. P. 72(a).

The first order (doc no 69) granted the Defendants' Motion for a Protective Order Regarding Plaintiff's Rule 30(b)(6) Notice of Deposition.  Plaintiff served on Defendants a notice of deposition seeking to depose a representative of an entity pursuant to Fed. R. Civ. P. 30(b)(6).  Defendants sought a protective order, which Magistrate Judge Watanabe granted in the order at issue, on the grounds that the Defendants in this case are all individuals and no representative of a non-party agency can testify on their behalf.

In his objection (doc no 76), Plaintiff argues that since all the Defendants are named in their official capacities, the government entity employing these persons as agents is also named as a defendant.  Although not express, following Plaintiff's argument, Plaintiff presumably then contends that he should therefore be able to take the deposition of any of the government entity's representatives.  The problem with Plaintiff's argument, however, is that the government entity at issue here is the State of Colorado and its agencies, which is immune from suit under the Eleventh Amendment.  As I previously determined in my order (doc no 46) dismissing some of Plaintiff's claims, Plaintiff's naming the Defendants in their official capacity is permitted pursuant to *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny, which permits a state official to be sued in his or her official capacity for prospective injunctive or declaratory relief only.  *ANR Pipeline Co. v. Lafaver*, 150 F.3d 1178, 1188 (10th Cir. 1998) (naming state government official in official capacity is a "legal

21

fiction;" state official is not regarded as the "state").  Plaintiff has provided no legal authority

to show that a government entity protected by Eleventh Amendment immunity is required

to respond to a 30(b)(6) notice of deposition[7] in these circumstances.  Magistrate Judge

Watanabe's order is not clearly erroneous or contrary to law; therefore, Plaintiff's objections

are overruled.

The second order at issue is an Order Regarding Plaintiff's Motion to Compel (doc

no 92).   Magistrate Judge Watanabe addressed Plaintiff's motion to compel certain

discovery responses and found that Defendants had adequately responded to the

interrogatory and requests for production at issue.  He therefore denied Plaintiff's motion

to compel.

Plaintiff's objections (doc no 100) concern only two of the discovery requests,

specifically RFP #23 and Interrogatory #4.  RFP # 23 sought documents substantiating Dr.

McCallin's list of reasons for terminating Plaintiff's employment.  Although Defendants

objected to the request on the grounds that it was overbroad, Defendants state that they

have no further non-privileged documents responsive to this request.  I see no clear error

in Magistrate Judge Watanabe's ruling regarding this discovery request.  Interrogatory #4

sought information about all contacts made by Ms. Hesse with Plaintiff's previous

employers after Plaintiff's termination in August 2006.  Defendants referred to Ms. Hesse's

deposition, wherein she was asked detailed and specific questions regarding this

information, and the contemporaneous documents relevant to Ms. Hesse's inquiries in this

_____

[7]Because only a notice of deposition is at issue here, I will not address the question of whether Plaintiff could have obtained the same information by way of a non-party subpoena.

regard.  Plaintiff argues that Ms. Hesse's deposition testimony was vague and that he is therefore entitled to seek further information by way of an interrogatory.  Since Plaintiff has already had adequate opportunity to obtain information on this issue and does not claim any difficulty in identifying the relevant documents, I again conclude that Magistrate Judge Watanabe's order is not clearly erroneous or contrary to law.  Plaintiff's objections are therefore overruled.

Accordingly, it is ordered:

1.      Defendants' Motion for Summary Judgment (doc no 119) is granted.

2.      Plaintiff's objections (doc nos 76 and 100) to the orders of Magistrate Judge Watanabe are overruled and the orders are affirmed.

3.      Defendants may have their costs.

DATED at Denver, Colorado, on August 26, 2009.

BY THE COURT:


s/ Walker D. Miller
United States Senior District Judge